IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

THOMAS CASSIDY,

      Plaintiff,

vs.                                                        Case No. 5:10cv212/RH/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

      Defendant.

_____/

### ORDER, REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      Plaintiff protectively filed an application for DIB on March 1, 2005, and alleged disability beginning October 11, 2001 (Tr. 12).[1]  His application was denied initially and on reconsideration

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on November 17, 2010 (Doc. 14).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number that appears at the top right of the page.

(*id.*).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and following a hearing held July 16, 2008, the ALJ issued a decision in which he found Plaintiff "not disabled" under the Act (Tr. 12–21).  The Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4–6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

In a decision issued on September 3, 2008, the ALJ made several findings relative to the issues raised in this appeal (Tr. 12–21):

1)      Plaintiff is insured under the Act through December 31, 2006.[2]

2)      Plaintiff did not engage in substantial gainful activity during the relevant time frame.

3)      Plaintiff has the following severe impairments:  degenerative disc disease ("DDD") of the lumbar spine and cervical spine, back pain, status post cervical sprain/strain, status post right shoulder rotator cuff tendonitis, status post right rotator cuff impingement with right shoulder pain, status post arthroscopy and subacromial decompression of the right shoulder, status post kidney stones, and status post adjustment disorder with depressed mood.

4)      Plaintiff's impairments, alone or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)      Plaintiff has the following residual functional capacity ("RFC").  He can sit, stand, or walk six hours; lift twenty pounds occasionally and up to ten pounds frequently; balance and climb ramps or stairs frequently; kneel, crouch, crawl, stoop, and reach overhead occasionally; and handle, finger, feel, see, and communicate limitlessly. He cannot work at unprotected heights or around dangerous machinery; he cannot climb ladders, ropes, or scaffolds; and he is limited to low level semi-skilled to unskilled occupations (secondary to adjustment disorder).

6)      Plaintiff cannot perform any past relevant work and has no skills that transfer within his RFC.

---

[2] Thus, the time frame relevant to this appeal is October 11, 2001 (alleged onset) to December 31, 2006 (date last insured).

7)       Considering Plaintiff's age, education, work experience, and RFC, Plaintiff is not disabled because he has work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment

must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    RELEVANT BACKGROUND INFORMATION

A.    Plaintiff's Personal History

Plaintiff was born in May 1956, and he attended school through the eleventh grade (Tr. 83, 106, 209).  He previously worked as a general mechanic and automotive electrician (Tr. 200–01, 256–57). Plaintiff alleges disability beginning October 11, 2001, due in large part to a work-related

accident that injured his right arm and two subsequent automobile accidents that injured his back (*see* Tr. 17).  Plaintiff alleges that as a result of all three accidents he cannot lift more than ten pounds, has limited movement and use of the right shoulder, and has constant back pain that radiates down his legs and affects his ability to sit, stand, walk, and drive (Tr. 17, 200, 244–45).

> B.     Plaintiff's Medical History[3]

Plaintiff was injured at work on October 4, 2001, while moving a 300-pound motor with a co-worker (Tr. 17).  He presented to an emergency room and reported experiencing a "sudden, tearing, burning type sensation in the right elbow" and right elbow pain (Tr. 538).  X-rays were obtained, which revealed a "normal" right elbow (*id.*).

On October 11, 2001, Plaintiff was evaluated by Christo W. Koulisis, M.D., in connection with the elbow injury and related workers compensation claim (Tr. 363).  Although Plaintiff presented with multiple complaints, including complaints of right arm, elbow, knee, and forearm pain, as well as "multiple joint complaints," Dr. Koulisis noted that the only symptoms attributable to Plaintiff's injury at work were those related to his right arm (*see id.*).  Within about a month of the injury, on November 9, 2001, Dr. Koulisis opined that Plaintiff could return to work with a forty-pound weight restriction (Tr. 537).  Within about two months, on or about December 14, 2001, Dr. Koulisis diagnosed "elbow strain," determined Plaintiff had reached maximum medical improvement ("MMI"), and discharged Plaintiff from treatment with a 0% impairment rating and no work restrictions (Tr. 363, 537).

Plaintiff sought treatment for his elbow from Steven S. Donchey, M.D., beginning in February 2002 (*see* Tr. 537, 718).  Dr. Donchey initially assessed right medial epicondylitis ("tennis elbow"[4]) and right shoulder rotator cuff tendinitis and chronic subacromial bursitis, rule out possible tear (*see* Tr. 717–18).  He advised Plaintiff to begin physical therapy ("PT") and prescribed Celebrex (Tr. 718).

---

[3]  The following review of Plaintiff's medical records is quite extensive.  The court feels compelled to discuss the medical record at such length, in effect to conduct a complete de novo review of the ALJ's decision, for two reasons.  First, Plaintiff's counsel, David Evans, declined to participate in the administrative hearing in this case.  Second, although he initiated this case and filed a memorandum in support of his position while still a member in good standing of the Florida Bar, Mr. Evans currently is under suspension from the practice of law.  Both circumstances are discussed in greater detail *infra*.

[4]  *See, e.g.,* http://www.nlm.nih.gov/medlineplus/ency/article/000449.htm (last visited August 9, 2011).

Plaintiff obtained an MRI of the right shoulder on March 4, 2002, which revealed an essentially "normal shoulder" with no tears but some osteoarthritis, tendinitis, and bursitis (Tr. 360, 720–21).  Three days later Plaintiff returned to Dr. Donchey (Tr. 716).  Dr. Donchey noted that Plaintiff had no elbow pain and was "doing quite well with his elbow," although he complained of shoulder pain with overhead reaching or sleeping on his right side (*id.*).

Plaintiff was involved in a motor vehicle accident ("MVA") on or about April 13, 2002, and he presented to the North Okaloosa Medical Center ("NOMC") with complaints of back pain and mild neck pain radiating to both shoulders (Tr. 361, 542).  X-rays of the shoulders were normal, while x-rays of the cervical spine revealed some narrowing at C6-C7 (Tr. 361, 732–34).  Plaintiff was discharged with a prescription for Motrin and referred to his family physician (Tr. 543, 730).

Plaintiff returned to Dr. Donchey on April 23, 2002, and Dr. Donchey noted that Plaintiff's elbow pain had resolved and that Plaintiff had been "doing well" until the April 13 MVA (Tr. 362, 715).  Dr. Donchey noted Plaintiff's treatment at the NOMC and commented that the MVA may have exacerbated the right elbow injury; he also noted that Plaintiff was somewhat limited in straight leg raising on the right (Tr. 362, 715).  In May 2002, Dr. Donchey assessed lumbosacral sprain-strain (rule out herniated nucleus pulposus), cervical sprain, trapezius myofascitis, intrascapular myofascitis, posterior tension headaches, trochanteric bursitis in the hip (improved), and medial epicondylitis (improved) (Tr. 714).

A lumbar MRI obtained on June 3, 2002, revealed disc protrusion at L5-S1 with mild impingement on the thecal sac and moderate impingement at the right nerve root, moderate loss of height and signal intensity at L5-S1, and slight posterior annulus bulging at L4-L5 without impingement on the thecal sac or nerve roots (Tr. 719).

Upon referral from Dr. Donchey, Plaintiff saw a pain management physician, Frank Zondlo, M.D., on July 3, 2002 (Tr. 707).  Dr. Zondlo assessed "probable right L5 radiculopathy" and administered a right L5 transforaminal epidural steroid injection (Tr. 703–04).  After the injection Dr. Zondlo noted that Plaintiff exhibited full strength in the right foot dorsiflexors and could heel walk without difficulty (Tr. 708).  He also stated that Plaintiff's back pain was resolved, Plaintiff had no tenderness to palpation, and Plaintiff estimated pain relief at "80–90%" (*id.*).

On July 15, 2002, Plaintiff apparently presented to Deshar Lutfi., M.D., with complaints of back pain and radiating and migraine-producing neck pain, as well as shoulder stiffness and hand numbness (*see* Tr. 359 (notation made by another physician in a November 2004 summary of Plaintiff's previous treatment)).  In July 2003, Dr. Lufti observed "electrodiagnostic evidence of moderate right carpal tunnel syndrome [but] the rest of the study, including right upper arm and both legs, electrically, was negative" (*id.*).

On July 17, 2002, Plaintiff returned to Dr. Zondlo, who noted that upon examination Plaintiff exhibited "complete return of sensation and strength [in the L5 area] with only minimal tenderness in the L5 paraspinal muscles" (Tr. 701).  Thus, Dr. Zondlo commented, the steroid injection at L5 had provided good, prolonged relief (*see* Tr. 699).  Also on July 17, Dr. Zondlo administered diagnostic fluoroscopic injections at C4, C5, and C6, which caused some stiffness in the neck but produced good pain relief immediately following the procedure; moreover, Plaintiff's neck was described as non-tender in all areas except at the injection sites (*see* Tr. 701–02).  Plaintiff was advised to return for follow-up in about two weeks (Tr. 702).  Plaintiff returned on August 1, 2002, and reported that his cervical pain was "basically unchanged," that the cervical diagnostic injections provided only minimal relief and, "in fact," that his pain was "basically the same degree on his drive home" following the cervical injections on July 17  (Tr. 700).  Dr. Zondlo recommended a cervical MRI in order to properly evaluate Plaintiff's condition (*see id.*).

A cervical MRI was obtained on August 29, 2002, which revealed mild disc degeneration at C5-C6 (with a moderate but wide left posterior disc herniation that represents "at least protrusion" and causes a slight deformity of the left anterior margin of the cord); mild disc degeneration at C5-C6 ("with small and wide combination of disc protrusion and sondylitic ridge" that causes some crowding of the cord and mild narrowing of the left foramen); a "quite small" left posterior disc bulge at C7-T1, without cord deformity; and a small posterocentral disc protrusion at C4-C5, without cord deformity or impingement (Tr. 359, 547–48, 699).

Plaintiff returned to Dr. Zondlo on September 11, 2002, after Dr. Zondlo had reviewed the cervical MRI results (Tr. 699).  Plaintiff reported low back pain that was more severe than his neck pain (*id.*).  Upon examination of the neck, Plaintiff reported some paraspinal muscle tenderness on the right at C5-C6, and he exhibited a mildly limited neck range of motion but no sensory deficit,

weakness, or reflex dropout (*id.*).  Dr. Zondlo mentioned the possibility of right C6 radiculopathy, noting that Plaintiff exhibited some "patchy sensory deficit" at C6 during the August 1 examination, although he exhibited no such deficit during the September 11 examination (*see* Tr. 699–700). Examination of the back on September 11 produced more positive findings than did examination of the neck (*see* Tr. 699).  Dr. Zondlo diagnosed right L4 radiculopathy and administered an epidural steroid injection at L4 (since, Dr. Zondlo noted, the same injection at L5 had been so successful) (*id.*).  After the injection Dr. Zondlo noted that Plaintiff exhibited full strength in the right foot dorsiflexors, the L4 paraspinal muscles were non-tender to palpation, sensation in the L4 dermatome was intact, and straight leg raising was performed without pain, although Plaintiff reported pain in the right hip, lateral thigh, and superior knee (Tr. 698).  Plaintiff returned to Dr. Zondlo on October 2, 2002 (Tr. 696).  Dr. Zondlo's report suggests that the injection at L4 was successful, but he noted that Plaintiff complained of right hip, thigh, and knee pain (*id.*).  Dr. Zondlo surmised that Plaintiff was likely experiencing some residual L5 radiculopathy, and he advised Plaintiff to return in two weeks for another injection at L5 (he noted that during the first injection at L5 the nerve root was not in optimal view) (*see id.*).  Dr. Zondlo advised Plaintiff to refrain from work for two weeks (i.e., between October 2, 2002, and the date he was supposed to return for the second injection at L5) (*id.*).

On October 17, 2002, Plaintiff returned to Dr. Donchey (Tr. 711).  Plaintiff reported that the injections provided no significant improvement for his neck or low back (*id.*).  He also reported persistent right shoulder pain (*id.*).  An examination of the shoulder and elbow revealed normal alignment and contour (*id.*).  Range of motion in the shoulder was decreased, but it was normal in the wrist and elbow (*id.*).  Dr. Donchey noted that Plaintiff's shoulder MRI was negative, and he prescribed anti-imflammatory medication and PT (Tr. 362).  In November 2002, Dr. Donchey reported he had treated Plaintiff for both the work injury and the April 2002 MVA, that the same shoulder was injured in both incidents, and he reiterated that Plaintiff had been doing well with the elbow condition between the incidents although he was not convinced the shoulder fully healed in the interim (*id.*).  Dr. Donchey also stated that Plaintiff's elbow, cervical spine, and lumbosacral conditions were worse as a result of the MVA (*id.*).

In January 2003, Mark M. Williams, M.D., conducted an independent medical examination related to Plaintiff's on-the-job injury (Tr. 536, 630–36).  Dr. Williams opined that Plaintiff's shoulder injury had healed and that Plaintiff subsequently re-injured his shoulder in the April 2002 MVA (*see* Tr. 536, 631).  He suggested that the elbow injury had not fully healed before the MVA, and that surgery for both the elbow and shoulder might be appropriate (*see* Tr. 630).  Finally, Dr. Williams opined that Plaintiff could return to work as long as he avoided overhead activity with the right upper extremity, lifting more than twenty pounds, hammering, and vigorous pulling or wrenching (*id.*)

Plaintiff occasionally saw Thomas Fox, D.O., in 2003 for treatment related to his right elbow and shoulder.  Dr. Fox's treatment notes reflect, essentially, his belief that Plaintiff injured both his elbow and shoulder in the work-related incident and that by March 2003 neither had healed (*see* Tr. 588).  In one treatment note, dated March 17, 2003, Dr. Fox stated that both shoulder and elbow surgery were recommended/warranted, but in a treatment note dated two months later he stated that surgery was warranted only for the shoulder and not the elbow (*see* Tr. 588, 587).  Regardless, the treatment notes reflect Dr. Fox's belief that Plaintiff was capable of light duty work in 2003 (*see, e.g.*, Tr. 588).[5]

Plaintiff was treated at Flowers Hospital following a second MVA on July 12, 2003.  Steven Fernandez, M.D., described as "negative" x-rays of Plaintiff's shoulder, cervical spine, and lumbar spine (Tr. 360).  Plaintiff was discharged with prescriptions for Motrin and a cervical collar (Tr. 550).  A cervical MRI, obtained July 18, 2003, revealed no substantial change since the August 2002 MRI (Tr. 359, 519, 546).  A lumbar MRI, obtained July 26, 2003, revealed mild degenerative facet disease, mild hypertrophy, mild bilateral narrowing of the lateral recess at L4-L5, and mild disc degeneration at L5-S1 and T11-T12, but no evidence of lumbar disc herniation (Tr. 359, 519, 545).

On July 31, 2003, Plaintiff presented to R. Barry Lurate, M.D., in connection with his workers compensation claim (Tr. 538).  Plaintiff advised Dr. Lurate that his elbow pain has "done

---

[5] Dr. Donchey, who is apparently Dr. Fox's partner (*see, e.g.*, Tr. 585), also believed Plaintiff was capable of work.  Specifically, Dr. Donchey opined on November 21, 2002, that Plaintiff was capable of performing light duty work and, similarly, opined on February 27, 2003, that Plaintiff could work as long as he did not lift more than ten pounds with the right hand or flex or extend the wrist (Tr. 589, 710).

nothing but persist since [the on-the-job accident in October 2001] with no signs of improvement now nearly two years later" (*id.*).  He also reported unresolved shoulder pain related to the job accident that is exacerbated with use the shoulder (*id.*).  Plaintiff exhibited a diminished range of motion in the shoulder (apparently, due to "guarding") and neck, but full range of motion in the elbow (Tr. 536).  Dr. Lurate's impressions were chronic medial epicodylitis in the right elbow (related to the on-the-job injury), likely capable of surgical resolution, and chronic right shoulder pain (likely related, initially, to the on-the-job accident but exacerbated by "the MVA" (it is unclear whether Dr. Lurate is referring the first or second MVA)) (*see* Tr. 535).  Dr. Lurate recommended arthroscopic shoulder surgery (Tr. 535–36).

Plaintiff presented to Stuart Steiger, D.C., on August 11, 2003, and reported he had been "in his usual state of health until being involved in a [MVA] on July 12, 2003" (*see* Tr. 359).  Plaintiff noted that following the first MVA his neck pain "had resolved," and although he experienced low back pain after the first MVA it was "not constant" and no longer radiated into the right leg (*id.*).  Plaintiff reported that at present, however (i.e., following the second MVA), his symptoms were "much worse," including those related to his neck, upper back, and left upper extremity (*id.*).  Chiropractor Steiger treated Plaintiff from the initial visit in August 2003, through January 26, 2004.[6]  On the last visit Plaintiff reported continued symptoms with "mild increased pain to his neck and upper shoulder regions," as well as pain in his back and legs (Tr. 360).  On the same day Chiropractor Steiger observed "no problems . . . as [Plaintiff] moved about the office," although Plaintiff displayed a moderately to severely restricted range of motion in the shoulder and some limited mobility in the cervical, thoracic, and lumbar areas of the spine (*id.*).

X-rays obtained on August 18, 2003, revealed mild disc degeneration at C6-C7, mild thoracic spondylosis, and mild disc degeneration at L5, S1 (Tr. 522–25).

On November 19, 2003, Plaintiff underwent right shoulder arthroscopy with decompression for rotator cuff impingement (*see* Tr. 568, 574, 582).  Plaintiff developed moderate stiffness and continued to complain of pain after the surgery (Tr. 568, 574).  He was referred to PT, and after a time Dr. Fox concluded that Plaintiff was not making significant progress (*see* Tr. 568, 574).  Dr.

_____

[6] As discussed more fully *infra*, Plaintiff returned to Dr. Steiger on one occasion in February 2005 (Tr. 446).

Fox therefore recommended that Plaintiff undergo right shoulder manipulation under anesthesia, and the manipulation was performed on April 7, 2004 (*see* Tr. 568, 574).

Plaintiff returned to Dr. Fox for follow-up on April 21, 2004.  Dr. Fox noted that Plaintiff's right shoulder abduction was "much improved," and flexion and extension were "also improved," although Plaintiff's rotation was moderately restricted (Tr. 567).  Plaintiff had no subjective complaints of pain (*id.*).  In May 2004, Dr. Fox assessed "status post [right shoulder] manipulation under anesthesia for chronic right shoulder pain and stiffness," and he opined that Plaintiff had reached MMI for the shoulder (Tr. 558).  He assessed a 5% impairment rating, recommended vocational rehabilitation, and opined that Plaintiff could likely perform light duty work (*id.*).

On November 10, 2004, Plaintiff was examined by John C. Warburton, M.D., at the request of Plaintiff's automobile insurance carrier (Tr. 328, 355–65).  It appears that Dr. Warburton was asked to determine the extent to which each MVA contributed to Plaintiff's current condition.  Thus, the examination focused on Plaintiff's lumbar and cervical spine, as opposed to his right arm, although Dr. Warburton extensively reviewed all of Plaintiff's past relevant medical records and MRIs (*see* Tr. 358–63).  Dr. Warburton made following observations and conclusions:

    (1)    <u>Cervical Spine</u>  (Tr. 356, 358)

> • Plaintiff walked with some difficulty on the toes and heels, "asserting that this is the cause of his pain"
> • Although Plaintiff displayed some discomfort in the lower posterior area of the neck and some limitation and discomfort at the extremes of motion, he exhibited "no tenderness to speak of," tightness, or spasm
> •  Plaintiff displayed full muscle strength (described as "5/5") "from the shoulder down"
> • Plaintiff's reflexes were equal and essentially normal ("1+"), and sensation was intact
> • Plaintiff displayed limited ranges of motion

    (2)    <u>Lumbar Spine</u>  (Tr. 357–58)

> • Plaintiff walked with some difficulty, asserting he "was having too much pain to walk on his toes and less so on his heels"
> • Plaintiff was tender and had poor musculature in the low back at the right sacroiliac area, and compression and rotation testing in the same area produced pain

- Plaintiff had full muscle strength "from the hips down," knee and ankle jerks were 1+ and equal, plantar responses were normal (downgoing), and no clonus was present
- Plaintiff displayed limited ranges of motion
- Straight leg raising was positive in a recumbent position at 65 degrees, bilaterally, with low back discomfort, but was negative at 85 degrees in a sitting position

Dr. Warburton diagnosed DDD of the cervical and lumbar spine (Tr. 358).  He noted that Plaintiff generally had the same complaints following the first and second MVAs and that MRIs following the second MVA were not materially different from those following the first MVA (Tr. 363).  He also noted that Plaintiff was not seeing a physician for his lumbar and cervical issues between the two MVAs, but rather was receiving care from Dr. Fox for the work-related injury at that time; thus, it was difficult to assess Plaintiff's physical capacities during the interval (*id.*). Notwithstanding, Dr. Warburton opined, the medical records do not substantiate "a continued significant disability or pain issue" during the interval because such issues would be reflected in Dr. Fox's treatment notes (Tr. 364).  Dr. Warburton then opined that two-thirds of Plaintiff's present condition is attributable to the second MVA, and one-third is attributable the first MVA.  He assessed Plaintiff with a 16% impairment of the whole person, with 5% resulting from the first MVA, and 11% resulting from the second.  He assessed no impairment resulting from the work-related injury and stated Plaintiff had no pre-existing impairment prior to the first MVA (364–65).

Plaintiff returned to Chiropractor Steiger in February 2005 for one visit, primarily to obtain a letter "for the food stamp office regarding his ability to work" (Tr. 328, 446).  A neurological examination was normal.  Additionally, Plaintiff walked without assistance (even though he presented using a cane), his gait was normal, he had no limp, and he was able to tandem walk (Tr. 329).  The Romberg's test was negative, all reflexes tested were normal, sensation in the upper and lower extremities was "without any significant deficit," and Plaintiff had normal muscle strength in all major muscle groups of the upper and lower extremities (*id.*).  Plaintiff exhibited some trigger point, muscle, and joint tenderness, and he displayed some limited range of motion in the shoulders, greater on the right (Tr. 330).  Straight leg raising tests were negative for radicular components, although Plaintiff complained of low back pain at 50 to 60 degrees forward elevation and back pain during several of the other tests (*see* Tr. 331).  Chiropractor Steiger noted that his findings upon

examination were consistent with "pathomechanical joint dysfunction," degenerative joint disease, chronic myofascial findings, and multiple area musculoskeletal complaints (*id.*).

On May 27, 2005, Plaintiff presented to Efiong Andem, M.D. (Tr. 435).  Dr. Andem observed that Plaintiff walked and sat without difficulty, and his physical examination in most areas tested was essentially normal (e.g., Dr. Andem noted full range of motion in the elbows, wrists, hands, hips, knees, ankles, great toes, neck and arms, as well as normal muscle bulk, strength (including grip strength), fine manipulation,  neuropsychological abilities, hearing abilities, push/pull abilities, and ability to change positions) (Tr. 436–37, 439–41).  Plaintiff exhibited some deficits, including limited ranges of motion in the cervical spine, lumbar spine, shoulders and right leg, as well as positive straight leg raising tests due to back pain (Tr. 436–37, 439).  Dr. Andem's relevant diagnoses or "impressions" were all based on Plaintiff's reports (*see* Tr. 437 (e.g., "chronic right shoulder pain in patient's own words")) (emphasis added), and he offered no opinions regarding Plaintiff's physical capacities.

On November 3, 2005, Plaintiff underwent an independent medical examination by Jerold A. Derkaz, M.D., a family practitioner (Tr. 398).  The results of Plaintiff's examination were normal in most areas tested, including his neurological system and extremities, and Plaintiff displayed full ranges of motion in the shoulders, hands, fingers, hips, knees, wrists, great toes, and ankles, with no swelling, tenderness, or crepitations (Tr. 399–401, 403–04).  The only abnormalities detected upon examination were reduced grip strength (although Plaintiff was able to turn a door knob and button and unbutton a shirt) and back limitations (*id.*).  Specifically, with regard to Plaintiff's back, Dr. Derkaz observed a decreased range of motion in the lumbar and cervical spine, as well as tenderness to palpation, an inability to squat, difficulty getting on and off the examination table, an unsteady gait, an inability to tandem walk or heel and toe walk, and positive straight leg raising tests "sitting and supine at 60° right and left" (Tr. 400).  In relevant part, Dr. Derkaz summarized his findings and recommendation as follows:

> [Plaintiff] shows a decrease in [range of motion] during exam today.  He complains of complete hearing loss in the right ear.  He had no difficulty with conversation during the exam.   He is currently not under the care of a physician or taking any medications due to finances. . . .  With exam findings and MRI documentation I would restrict him as follows: no overhead work, no repetitive pushing, pulling, bending, squatting, no kneeling, no crawling, no prolonged sitting or standing.

(Tr. 401).

Finally, the record contains four physical RFC assessments, completed at various times by four different non-examining agency physicians, each of whom opined that Plaintiff is capable of at least light work[7] (*see* Tr. 390–97, 423–30, 638–45, 688–95).

C.      Plaintiff's Administrative Hearing

Plaintiff's first hearing was scheduled for September 12, 2007, during which the ALJ intended to solicit expert telephonic testimony from a medical expert, Bruce Witkind, M.D., who is a board certified neurosurgeon and spine specialist (Tr. 774).  On the same day Plaintiff's counsel (David Evans) submitted numerous additional exhibits that the ALJ admitted into evidence (*see id.*). Attorney Evans then objected to Dr. Witkind testifying that day, asserting that before he testified he needed to review the additional evidence he (Attorney Evans) had just submitted (*see* Tr. 17, 774–75).[8]  The ALJ expressed frustration over the situation, which was caused by Attorney Evans' failure to timely submit the additional exhibits, and the ALJ essentially overruled Attorney Evans' objection and attempted to start the hearing by telephoning Dr. Witkind (*see* Tr. 775).  When reached by phone, however, Dr. Witkind indicated he had not been notified of the hearing and had not reviewed any of Plaintiff's records (Tr. 776).  The hearing was therefore continued to March 11, 2008.  When the parties reconvened on March 11, Attorney Evans again presented new evidence to the ALJ, which might have again been problematic in light of Dr. Witkind's inability to timely review the evidence, but the hearing had to be continued regardless because the ALJ was ill (*see* Tr. 12).  Thus, the parties convened for a third time, on July 16, 2008, and a hearing commenced (*id.*).

The transcript of the July 2008 hearing begins with a notation that Plaintiff is not present and that his attorney, David Evans, was present but left before the hearing started and, therefore, waived his right to cross-examine Dr. Witkind and the Vocational Expert ("VE") (Tr. 787).  The transcript also reflects that Attorney Evans was specifically advised by the ALJ that if he left, his right to cross- examine the witnesses would be waived (*see* Tr. 787–88).  The transcript further reflects that

---

[7] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

[8] Attorney Evans stated no objection to Dr. Witkind testifying by phone.

the hearing then began—and was conducted in its entirety—without Plaintiff or his counsel present.[9]

(1)    Summary of Dr. Witkind's Relevant Testimony and Opinions

Dr. Witkind testified first and discussed the February 2002 diagnoses related to Plaintiff's right elbow.  He characterized the elbow conditions as "mild," including the epicondylitis (which, according to Dr. Witkind, normally resolves quickly and appears to have done so in Plaintiff's case) (*see* Tr. 794–95).  He also noted the March 2002 MRI of the right shoulder, which revealed arthritis and tendinitis, and he stated that these conditions resolved with arthroscopic surgery (Tr. 795).

Dr. Witkind discussed the June 2002 lumbar MRI, which—as noted *supra*—revealed disc protrusion at L5-S1 with mild impingement on the thecal sac and nerve roots (Tr. 793 (referencing Tr. 719)).  Dr. Witkind opined that this MRI was of "no real significance in lumbar pathology" because the record establishes that the impingement resolved.  Dr. Witkind also explained that no other MRI, including the more recent lumbar MRI from July 2003, revealed any impingement or

---

[9] In the ALJ's decision, he provides additional information about the hearing:

> The claimant is represented by David E. Evans, an attorney.  At the time the [July 16, 2008] hearing was ready to proceed, Mr. Evans indicated that he had sent the claimant home because the hearing was beginning more than an hour late[] . . . .  The undersigned [ALJ] notes that the reason for this delay was because the prior scheduled hearing, which was also a case being handled by Mr. Evans, took longer than expected because of the testimony of two medical experts.  The undersigned notes that Mr. Evans had abandoned the prior hearing as well because the undersigned refused to order a consultative examination that Mr. Evans felt was necessary and [he] refused to continue the case for such examination.  Mr. Evans left the hearing room even before the instant hearing could be started.  The . . . reason given by the attorney for the claimant and the attorney failing to attend the [instant] hearing is not . . . a valid reason.  The undersigned would take note of the fact that this legal representative has a long standing history of engaging in similar behavior if he fails to get his way.  The fact that the claimant's hearing was starting late is simply not a valid reason for telling that claimant to go home and then leaving the hearing site.  Mr. Evans is aware of these facts but often conducts himself much like a small child who feels justified in throwing a tantrum if he does not get his way.  It is indeed unfortunate that his clients are often the ones having to suffer for his completely unprofessional behavior to the extent that they are not allowed to participate in the hearing and offer testimony.

(Tr. 12) (emphases omitted).  As noted *supra*, after Plaintiff and the Commissioner submitted memoranda in support of their positions in this case (docs. 20, 23), Attorney Evans was suspended from the practice of law for ninety-days, as evidenced by other filings in this court (*see, e.g.*, Jones v. Astrue, No. 5:11cv47/RS/EMT (doc. 16)) and information available on the Florida Bar's website.  Thus, the undersigned will order that a copy of this Report be provided to Todd Brister, the attorney handling Attorney Evans' affairs during the term of his suspension (*id.* at doc. 18).

root involvement (*see* Tr. 793–94, 799).  Additionally, he referenced Plaintiff's negative straight leg raising test (while sitting) when examined by Dr. Warburton in November 2004, and stated that the negative results are inconsistent with any impingement (*see* Tr. 799).  Dr. Witkind stated clearly that Plaintiff has no lumbar radiculopathy or any "neuro deformity" (*see* Tr. 794, 796).  Dr. Witkind also discussed the August 2002 cervical MRI and noted that it revealed some deformity on the left anterior margin of the cord (Tr. 797).  However, Dr. Witkind opined, this finding "may not mean much clinically" because it is inconsistent with Plaintiff's reported problems on his <u>right</u> side (Tr. 797).  In explaining the foregoing opinion, Dr. Witkind stated that Plaintiff's cervical degeneration is "on the wrong side," that is, Plaintiff complained of right-sided pain and symptoms, but his complaints do not correlate with MRI findings or neurologic tests (Tr. 801).  In sum, Dr. Witkind acknowledged that Plaintiff has cervical and lumbar DDD, but he stated that both conditions are mild and require no surgical intervention (Tr. 801–02).

Dr. Witkind considered Plaintiff's examination by Dr. Warburton in November 2004 (Tr. 799).  He testified that Dr. Warburton documented no neurologic abnormality, and Dr. Witkind opined that Plaintiff's performance on Dr. Warburton's straight leg raising test indicates symptom magnification (*see* Tr. 799).  He further testified that Dr. Warburton's lumber spine examination was normal, and he opined that there were no "other objective findings on examination . . . of any significance" (Tr. 799).  He agreed with Dr. Warburton's diagnosis of "muscular ligamentous with sprain/strain" but noted that the condition is transient (Tr. 802).

Dr. Witkind also discussed Plaintiff's treatment by Chiropractor Steiger.  In relevant part he noted that Plaintiff presented to Steiger in February 2005 using a cane, but without a cane he could tandem walk and his gait was normal (Tr. 792).  Thus, Dr. Witkind suggested, Plaintiff exaggerated his symptoms since a cane was not necessary (*see id.*).  Similarly, Dr. Witkind noted an entry in Chiropractor Steiger's records reflecting Plaintiff's score of "22 out of 24" on a disability assessment (Tr. 798).  This score, Dr. Witkind opined, clearly indicates symptom magnification because such a score would render a person "bed-bound" (*id.*).

Dr. Witkind next discussed the examination and findings by Dr. Derkaz in November 2005 (Tr. 800).  He testified that the findings were of no real significance since no neurologic deficits were detected, the examination was not actually conducted by Dr. Derkaz, and the findings "do[]n't

make very much sense" (Tr. 800–01).   Additionally, Dr. Witkind appears to suggest that certain findings were based on Plaintiff's subjective complaints (i.e., "tenderness"), as opposed to objective medical evidence (*see* Tr. 801).

Dr. Witkind testified that he is familiar with Social Security Regulations, including the listing of impairments, and he opined that none of Plaintiff's impairments meet or equal a listed impairment  (Tr. 790, 803).  He noted that Plaintiff's right shoulder impingement equates to a "five percent impairment rating," and he opined that Plaintiff is capable of performing light work (Tr. 803).  More specifically, Dr. Witkind opined that Plaintiff can lift twenty pounds occasionally and ten pounds frequently with both arms; push or pull up to twenty pounds with both arms; stand and walk six hours a day; sit without limitation; frequently balance and climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally kneel, crouch, crawl and stoop; and perform fingering and fine manipulation without limitation (Tr. 803–05).  Dr. Witkind added that Plaintiff should not reach overhead with either arm, but he can frequently reach in other directions, such as forward or sideways (Tr. 805–06).  Finally, he stated that Plaintiff has no environmental limitations other than the need to avoid work at unprotected heights (Tr. 806–07).

(2)     Summary of the Testimony of VE Robert Strader

VE Strader characterized Plaintiff's past relevant work as an auto mechanic as skilled work that is generally performed at a medium level of exertion (but "medium to heavy" as described by Plaintiff), and his past work as an electrician as "skilled" and "medium" (Tr. 810).  VE Strader testified that he listened to Dr. Witkind's testimony and, considering the physical capacities assessed by Dr. Witkind, there are jobs available that Plaintiff can perform, including cashier II, hand packer, security guard, and ticket taker (Tr. 811–13).  VE Strader stated that each of those four jobs are "light" jobs that can be performed within the restrictions assessed by Dr. Witkind (*id.*).

V.     DISCUSSION

Plaintiff contends the ALJ erred by taking Dr. Witkind's testimony over the phone, instead of in-person or by video teleconferencing.  He also contends the ALJ erred by relying "completely on consultative <u>examiner</u> Dr. Witkind" and failing to consider the opinions of other treating physicians that limit or preclude Plaintiff from work (Doc. 20 at 2) (emphasis added).

Before addressing Plaintiff's contentions, the undersigned notes that Plaintiff is mistaken in his characterization of Dr. Witkind as a consultative "examiner."  Dr. Witkind did not examine Plaintiff.  The distinction is important because, as this court is well aware, different weight is assigned to the opinions of examining and non-examining sources.  *See* 20 C.F.R. § 404.1527(d)(1) (the Commissioner will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.").  Similarly, greater weight is generally assigned to the opinions of treating sources, but "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (July 2, 1996).  Consequently, an ALJ must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*

In a complex case such as this, which involves conflicting medical opinions, conflicting medical evidence, and numerous records related to three separate accidents, an ALJ may employ a medical expert ("ME") to assist in understanding the evidence.  *See* 20 C.F.R. § 404.1527(f)(2)(iii) (expressly permitting an ALJ to secure the services of a ME to review the evidence and render an opinion as to the nature and severity of a claimant's impairments and whether those impairments meet or equal any listings); HALLEX I-2-5-34, 1994 WL 637370 (Sept. 28, 2005) (a ME may also be employed, among other reasons, to: (a) explain, clarify, or help resolve conflicting or confusing medical evidence, (b) explain the significance of clinical or laboratory findings, (c) assist the ALJ in determining a claimant's RFC, or (d) explain the etiology or course of a disease and how it may affect a claimant's ability to engage in work activities at pertinent points in time).[10]  Thus, in this case the ALJ properly exercised his discretion in securing the services of Dr. Witkind, a non-examining medical expert.

A.      Telephonic Testimony

Plaintiff's first contention, that the ALJ erred in obtaining Dr. Witkind's testimony by phone, is wholly without merit.  First, as Plaintiff acknowledges, HALLEX I-2-5-30, 1994 WL 637367

---

[10] The Hearings, Appeals and Litigation Law Manual ("HALLEX") is a policy manual written by the Social Security Administration to provide policy and procedural guidelines to ALJs and other staff members.  *See* Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000).

(Sept. 28, 2005) specifically provides for medical expert or vocational expert testimony via telephone or video teleconferencing (*see* Doc. 20 at 19–20).  The same HALLEX  provision also states that written interrogatories may be submitted to an ME, although the "preferred method for obtaining ME or VE opinion is through in-person testimony or testimony taken via telephone or video teleconference at a hearing."  HALLEX I-2-5-30 (emphasis added).  Second, Plaintiff's counsel stated no objection to the ALJ's course of action, even though counsel was aware at three different hearings that the ALJ intended to solicit Dr. Witkind's testimony by phone.  Third, counsel voluntarily chose to absent himself from the hearing at which Dr. Witkind testified and, correspondingly, voluntarily chose to give up his right to cross-examine him, so it matters not how his testimony was obtained.  Stated another way, the primary benefit of in-person testimony is the ability to observe demeanor, which assists in making credibility determinations, but Plaintiff did not challenge Dr. Witkind's credibility so he has no basis on which to claim error.  Fourth, although the Regulations apparently make no mention of telephonic testimony, *see, e.g.*, 20 C.F.R. §§ 404.936(c), 404.950(a) (discussing in-person testimony or testimony via video teleconferencing only), they do not prohibit telephonic testimony.  *See also* Hepp v. Astrue, 511 F.3d 798, 805–06 (8th Cir. 2008) ("[W]e do not believe that, in a non-adversarial proceeding, an in-person cross-examination would significantly increase the accuracy of determining a witness's credibility over that of a telephone cross-examination.  Additionally, an in-person cross-examination requirement would increase substantially the administrative costs and likely reduce the willingness of physicians to participate as consultative examiners.").

> B.      ALJ's Assigning Full Weight to the Opinions of Dr. Witkind

Plaintiff also contends the ALJ erred by relying exclusively on Dr. Witkind's opinions instead of other opinions in the record that restricted or precluded Plaintiff from work.

SSR 96-6p provides that "[f]indings of fact made by State agency medical . . . consultants and other program physicians . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources  . . . ."  SSR 96-69, 1996 WL 37418 (July 2, 1996).  The Ruling indicates that the medical opinions of such consultants must be considered, and it states that "State agency medical . . . consultants are highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability claims under the Act."  The

opinions of non-examining medical sources, "when contrary to those of examining [sources], are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence."[11] Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987).  However, the ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. Edwards v. Sullivan, 937 F.2d 580, 584–85 (11th Cir. 1991).  Additionally, where the ALJ has discounted the opinion of an examining source properly, the ALJ may rely on the contrary opinions of non-examining sources.  See Milner v. Barnhart, 275 Fed. Appx. 947 (11th Cir. 2008) (unpublished opinion) (where ALJ rejected conflicting opinion of onetime examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining psychologists); Wainwright v. Comm'r of Soc. Sec. Admin., 2007 WL 708971, No. 06-15638 (11th Cir. 2007) (unpublished opinion) (where ALJ rejected examining psychologist's opinion properly, the ALJ was entitled to rely on the opinions of non-examining state agency psychologists).

Here, a review of the ALJ's decision shows that he was aware of and discussed various medical records in Plaintiff's file, including MRI-related records and some of the treatment records of Dr. Zondlo, Dr. Williams, Dr. Fox, Chiropractor Steiger, Dr. Lurate, Dr. Derkaz, and Dr. Warburton (as well as psychological records not at issue in this appeal) (see Tr. 17–18).[12] Moreover, based on the substance of the questions posed by the ALJ to Dr. Witkind, it is evident that the ALJ was well familiar with the content of Plaintiff's file.  Likewise, Dr. Witkind specifically stated that he had reviewed Plaintiff's file prior to testifying (see Tr. 789–90).  Thus, although the ALJ did not mention every piece of medical evidence in his opinion, it is evident that he (and Dr. Witkind) considered Plaintiff's medical condition as a whole.  See Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," as long as the ALJ's decision "is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'") (quoting Foote, 67 F.3d at 1561).

---

[11]  When an ALJ employs a ME, the ME's opinions should be evaluated in the same manner as those of a non-examining agency physician.  See 20 C.F.R. § 404.1527(f)(2)(iii).

[12]  All of these physicians are not mentioned by name in the ALJ's opinion, but—even in the absence of a name—it is evident to whom the ALJ refers based on the date and nature of treatment noted (see Tr. 17–18).

Additionally, when the ALJ's opinion is read in conjunction with Dr. Witkind's testimony, the ALJ's reasons for assigning full weight to Dr. Witkind's opinions are clear.  First, the ALJ noted that Dr. Witkind is a spine specialist and "has specific expertise in this area" (Tr. 19).  *See* 20 C.F.R. § 404.1527(d)(5) (providing that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). The ALJ also noted that Dr. Witkind's opinions are based on substantial evidence in the record as a whole (*see* Tr. 19).  The ALJ then identified specific evidence in the record (and/or the opinions of Dr. Witkind, based on evidence in the record) that supports his decision to fully credit Dr. Witkind's testimony, including evidence demonstrating that: (1) the work-related injury to Plaintiff's elbow was mild and resolved quickly; (2) x-rays of the right shoulder were normal, (3) the nerve root impingement resolved, (4) arthroscopic surgery was successful, (5) Plaintiff's reported right-sided symptoms were inconsistent with the objective medical evidence, including MRIs, x-rays, and clinical findings, (6) Dr. Williams released Plaintiff to light work with certain restrictions, (7) Dr. Fox (and/or Dr. Donchey) released Plaintiff to light duty work, (8) Plaintiff exaggerated his symptoms (as evidenced by Plaintiff's performance on certain examinations and by Chiropractor Steiger's records), and (9) Dr. Warburton's November 2004 examination revealed mild findings and no neurological abnormalities (Tr. 17–19).  The ALJ also mentioned Dr. Derkaz's examination and, apparently relying on Dr. Witkind's testimony, concluded that the examination results were of little significance.[13]

---

[13] Dr. Witkind's testimony regarding Dr. Derkaz's examination is somewhat unclear, but both he and the ALJ suggest that his opinions were based in part on Plaintiff's subjective complaints, even though Plaintiff's examination did not substantiate those complaints.  For example, the ALJ noted that although Plaintiff reported "complete hearing loss in the right ear," Dr. Derkaz specifically noted that Plaintiff had no difficulty conversing during the examination (Tr. 18, 401).  Moreover, the court notes that Dr. Derkaz's report contains a section titled "review of systems," which provides areas to record any complaints made by Plaintiff with regard to twelve different bodily "systems" (i.e., general, head, eyes, ears, neck, lungs, gastrointestinal, genitourinary, musculoskeletal, neurological, psychiatric, and endocrine) (*see* Tr. 398–99).  Plaintiff reported symptoms in all twelve areas (*see id.*).  While it is not necessary to list all of Plaintiff's varied and numerous complaints, the undersigned notes that many of the complaints reported to Dr. Derkaz are wholly inconsistent with those reported to Dr. Andem approximately five months earlier.  For example, Plaintiff told Dr. Andem he experienced no shortness of breath, nausea, vomiting, intolerance to cold or heat, or emotional instability; he told Dr. Derkaz, however, that he experienced shortness of breath, recurrent nausea, headache-associated vomiting, "all season" intolerance to cold and heat, as well as depression, irritability, anxiousness, stress, panic attacks, and "compulsiveness about everything" (*compare* Tr. 436 *with* Tr. 399).  Furthermore, the results of Plaintiff's examination by Dr. Derkaz were similar to those of other examinations (i.e., a generally normal examination in most areas tested with some limitations related to Plaintiff's back).

Furthermore, as fully summarized *supra*, additional evidence in the record supports Dr. Witkind's opinions, including records from Dr. Koulisis (who released Plaintiff to work with a forty-pound weight restriction within a month of his work injury and with no restrictions within two months), Dr. Zondlo (who administered lumbar steroid injections that provided good, prolonged relief for the lumbar radiculopathy, and who restricted Plaintiff from work for only two weeks while awaiting a second recommended injection at L5 (which Plaintiff apparently failed to obtain)), and Dr. Warburton (who opined that Plaintiff had no impairment from the work-related injury and no "significant pain or disability issue" between the two MVAs).

Thus, as can be seen, the physicians who treated and examined Plaintiff released him to light duty work with certain restrictions (or offered no specific opinions as to his RFC).  Likewise, four non-examining agency physicians determined that Plaintiff was capable of <u>at least</u> light work with certain restrictions, a factor also considered by the ALJ in assigning great weight to the similar opinions of Dr. Witkind (*see* Tr. 19).  Although the various examining and non-examining physicians' light work <u>restrictions</u> are not identical, the ALJ certainly did not err in relying on the testimony of Dr. Witkind in determining which restrictions should be included in Plaintiff's RFC for light work.  He likewise did not err in discounting certain evidence based upon Dr. Witkind's expert opinion that the evidence was unreliable or clinically insignificant.

VI.    CONCLUSION

Although Plaintiff is represented by counsel, in light of counsel's decision leave Plaintiff's administrative hearing before it started (and, apparently, his instructing Plaintiff to do the same), the undersigned has spent a longer-than-average time studying and summarizing the voluminous record in this case.  The undersigned did so in order to independently determine whether the ALJ conducted

---

While the ALJ could have better explained his decision to discount some of Dr. Derkaz's opinions, the undersigned finds no reversible error in his failure to do so.  Initially, based on the foregoing comparison between Dr. Andem's report and Dr. Derkaz's report, it is evident—as the ALJ suggests—that Plaintiff exaggerated his symptoms when he presented to Dr. Derkaz.  Moreover, Dr. Witkind, who is a spine specialist, read Dr. Derkaz's report, considered the results of the examination he conducted, and concluded—in his expert opinion—that the examination was of no real significance since no neurologic deficits were detected.  It should also be noted that Dr. Derkaz did not opine Plaintiff was totally restricted from all work; rather, he opined that Plaintiff could work with certain restrictions, including, for example, "no overhead reaching," which restriction was also imposed by Dr. Witkind and considered by VE Strader.  Finally, Plaintiff's counsel could have questioned—but chose not to question—Dr. Witkind about all of his opinions, including those related to Dr. Derkaz.  Likewise, counsel could have presented a hypothetical question to the VE that included all of Dr. Derkaz's restrictions, but counsel chose not to do so.

a fair administrative hearing, fully developed the record,[14] and reached a decision that is supported by substantial evidence on the record as a whole.[15]  Having done so, the undersigned confidently concludes that the Commissioner's final decision should be affirmed.

While the ALJ's decision could have been written with more clarity, when his decision is compared with the relevant medical records and transcript of Plaintiff's administrative hearing, it is evident that the ALJ considered Plaintiff's condition as a whole and properly relied on Dr. Witkind's opinions in making his findings.  It is also evident that the ALJ's overall findings are generally consistent with the medical opinions of record, as no physician opined that Plaintiff is "disabled" or otherwise precluded from work for any significant period of time.  Rather, the opinions of record establish that Plaintiff can perform (at least) light work with certain restrictions.  The ALJ thus committed no error in relying on the opinions of ME Witkind, since his opinions were generally consistent with those of Plaintiff's treating and examining physicians.  *See* Edwards, 937 F.2d at 584–85 (11th Cir. 1991).  And, to the extent the opinions of record differed in some, relatively minor respects, the ALJ acted properly in employing an expert to assist him in resolving the differences.

For all these reasons the undersigned concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, there is no basis to conclude that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**:

That a copy of this Report and Recommendation be provided to Attorney Todd C. Brister by mail at 108 West 4th Street, Panama City, FL 32401, and by electronic mail at tbrister@knology.net.

---

[14] An ALJ has an affirmative duty to develop a full and fair record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  The duty to develop the record exists even though the plaintiff is represented by a lawyer or paralegal.  Brown, 44 F.3d at 934 (citing Clark v. Schweiker, 652 F.2d 399, 404 (5th Cir. Unit B July 1981)); Smith, 792 F.2d at 1551 (citing Cowart, 662 F.2d at 735).

[15] The undersigned carefully analyzed the record in this case even though Plaintiff's counsel did not abandon Plaintiff's case (subsequent to Plaintiff's hearing counsel filed a brief in support of Plaintiff's complaint).  Moreover, the Commissioner filed a response to Plaintiff's brief and this case became ripe for review prior to Attorney Evans' current ninety-day suspension from the practice of law.

And it is it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 9th day of August 2011.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).